### MOSSMAN v CINCINNATI (city)

Ohio Appeals, 1st Dist, Hamilton Co

Decided May 11, 1936

62

Kunkle & Kunkle, Cincinnati, for appellee.

John D. Ellis, City Solicitor, Cincinnati, J. B. Grause, Jr., Cincinnati, and Edgar B. Traver, Cincinnati, for appellant.

### OPINION

By MATTHEWS, J.

The appellee, a minor, while riding in an automobile operated by his father was injured in a collision between the automobile and the end of a safety zone structure in Madison road, a public street in the city of Cincinnati. He recovered a judgment against the city of Cincinnati for damages on account of such injuries and it has ap-

pealed on questions of law from that judgment to this court.

The plaintiff, appellee, alleged that the collision occurred in the night season, that the structure was directly in the path of the traveled portion of the street without lights or warning signs, so as to indicate to operators of automobiles the presence of said obstruction, that the defendant knew or should have known that said obstruction was not lighted, and that as a result "of the negligence and carelessness of said defendant in erecting and maintaining said obstruction as a barrier in the pathway of the traveled portion of said highway after dark without warning signs or lights of any character whatsoever," plaintiff was injured.

The defendant admitted that it caused to be erected on Madison road at or near the intersection of Madison road and Millsbrae Avenue, a loading platform for persons boarding or about to board street cars operated in and upon said Madison road, and that on the east end of the platform it caused to be constructed and maintained an iron rail or guard. It denied all other allegations.

The evidence disclosed that this structure was the usual type of loading platform. It was made of concrete six inches thick, four feet wide, and forty-five feet long. It was located close to the westbound street car track, with a space of twenty-two feet between it and the curb for westbound vehicular travel. On the east end of the platform was a bumper consisting of four metallic upright rails, about three feet high, bound together by horizontal strips, the entire bumper structure being four feet wide, and on this bumper was fastened a reflector made of glass fifteen inches across the face in a case containing reflector elements. The lights from an automobile headlights would be reflected in red by this device. There were more than three hundred loading platforms in the streets of Cincinnati. Over the platform were suspended two electric lights to light the platform for persons using it and so that the street car operator could see whether any prospective passengers were on the platform, and they also undoubtedly served to bring the whole platform into greater prominence for the benefit of all users of the street. These overhanging lights were not physically connected with the platform or bumper.

The accident occurred on February 12, 1934, and this platform had been at that place for about four years in the same

condition that it was in at the time of the accident.

The two lights overhanging the platform were operated by a clock device, which the evidence shows was affected by variations of temperature. If the clock was set to turn on these lights at a given time, zero or sub-zero weather would cause it to work more slowly than anticipated and, as a result, the lights would be turned on at a time later than that set for them to go on. If the weather was very severe, it might cause the clock to stop. However, when the weather moderated the clock would resume its normal functioning without any repairs or readjustment being made.

It appeared that three or four days prior to February 12, 1934, the temperature was below zero but that it had steadily risen and that on that day it fluctuated between 27 and 38 above zero, which was normal for that day according to the United State Weather Bureau.

The father, who was operating the automobile, had lived east of this point and had been accustomed to use Madison road in going to the business section of Cincinnati and to his place of work. Unquestionably, he was thoroughly familiar with the character of this safety zone and of its location in Madison road.

On the night of the accident it was raining. It was a rainy, misty night. The lights over the platform were not burning at the time which was about 6:35 P. M., although the clock had been set so as to turn them on a few minutes earlier.

Madison road is straight for several blocks west of Millsbrae. The father testified that he proceeded along this straight stretch at about twenty-five miles per hour, that his automobile headlights were on, and that at the rate of speed at which he was traveling he could stop his automobile in from ten to twenty-five feet, but that he did not see the safety zone and ran against the bumper.

There was evidence that others proceeding along Madison road at various times before and after the accident noticed that the overhanging lights were not burning.

Madison road is a street fifty or sixty feet wide upon which were boulevard electric lights, one of which was located about twenty-five feet from this bumper and three or four feet to its east. The evidence showed that this light was burning. The father explained the collision by saying that "On February 12th, it was melting temperatures melting and still slushy and this slush from the traffic no doubt covered the end of the loading zone and it was dirt there at the time. Driving along there, no lights, it just loomed up before you, you could not see anything."

The snow, (less than two and one-half inches during the three preceding days) did not cover the surface of the street to any appreciable depth, as the temperature was above freezing all during that day, but the street was wet and there was some water and perhaps a slight amount of snow.

The defendant, appellant, contends that the collision was caused solely through the fault of the operator of the automobile without any contributing fault on its part and that therefore the court should have sustained its motion for an instructed verdict, and that this court should reverse the judgment and enter final judgment in its favor.

The plaintiff, appellee, claims that his injuries were caused by the failure of the defendant, appellant, to perform the duty imposed upon it by §3714, GC, which confides the care, supervision, control and regulation of the use of streets upon municipalities and enjoins them to "cause them to be kept open, in repair, and free from nuisance."

A municipality discharges its full duty in that regard if it exercises reasonable care to construct and maintain a street in a reasonably safe condition for travel in the ordinary mode. City v Glaser, 76 Oh St 471; 28 Ohio Jur. 976.

If the street is reasonably safe for travel in the ordinary mode there is no condition therein constituting a nuisance, the essence of a nuisance being that it renders the street unsafe for travel in the ordinary mode. And using the street in violation of law cannot be characterized as a use in the ordinary mode.

A municipality has a right to establish safety zones in a street. Cleveland v Gustafson, 124 Oh St 607, 180 NE 50, 79 A.L.R. 1325. Such a structure is not a nuisance in itself. Id. It can only become so by improper construction or by negligently allowing a properly constructed one to fall into disrepair so as to make the street unsafe for travel in the ordinary mode.

The first question then is, whether this properly constructed safety zone had become a nuisance by reason of the overhanging lights not being turned on at the time.

The answer to that question may be reached by considering whether Madison road with the safety zone in it, without any overhanging lights, was reasonably safe for travel in the usual or ordinary mode. In determining this, we believe it is necessary to consider the physical condition of the street in conjunction with the law regulating the manner in which it should be used. The city had a right to assume that the law would be obeyed by those using the street and if it was reasonably safe for those using it in a lawful manner, then the city had performed its full duty in relation to the physical condition of the street. In constructing this safety zone in the street the city had a right to take into consideration the statutes relating to the use of public highways. §6310-1, GC, provides in part that:

"Whenever there is not sufficient light within the limits of the traveled portion of the highway to make all vehicles, persons, or substantial objects clearly visible within a distance of at least two hundred feet, the forward lights which a motor vehicle, except commercial vehicles as hereinafter provided, is required to display, shall, when the motor vehicle is in motion, throw sufficient light ahead to show any person, vehicle, or substantial object upon the roadway straight ahead of the motor vehicle for a distance of at least two hundred feet."

And, by §12603, GC, it is provided, inter alia, that "No person shall drive any motor vehicle in and upon any public road or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead."

These statutes were enacted to establish rules of conduct for the protection of all users of the highways. Compliance prevents injury not only to others, but, also, self-injury. They imposed absolute duties, the violation of which subject to penalties and civil liabilities. Skinner v Pennsylvania Rd. Co., 127 Oh St 69; Gumley v Cowman, 129 Oh St 36, 1 O.O. 318.

A street, the condition of which is reasonably safe for lawful use and can be made to cause harm only by ██ a violation of law must be held to be reasonably safe for travel in the usual manner. And a municipality that so constructs a street must be held, to have discharged the duty imposed upon it by §3714, GC.

In City of Elyria v Meacham et, 113 Oh St 138, it was held, as stated in the third paragraph of the syllabus that:

"Where the safety and convenience of public travel upon any street necessitate such separation of grades, the railroad company and the city, acting in good faith and upon the advice of competent civil engineers, may determine the character of the bridge or structure to carry the elevated railroad tracks. And when the structure, completed according to the plans and specifications agreed upon and adopted by the city and the railroad company, leaves ample clear space for all public travel upon the street, it is error for a trial court, in an action brought by one who has suffered an injury on the street thus spanned by an overhead bridge, to charge the jury that the question whether the piers in the street constitute a nuisance is one for the jury to decide."

And the Supreme Court rendered final judgment for the city of Elyria.

This safety zone bumper was a substantial object in the street. It was in no sense hidden. Its size made it more █ readily seen even without a reflector, than a person in the street. §6310-1, GC placed the duty upon the operator to have his automobile equipped with forward lights that would disclose this substantial object at least two hundred feet away. And §12603, GC, made it unlawful for him to operate his automobile at a speed which would prevent him from stopping it within the assured clear distance ahead. Under such circumstances, the safety zone bumper could not be regarded as a defect in the street or as a cause of an injury. It was a condition but not a cause of the collision. The street so constructed was reasonably safe for travel in the ordinary mode and the city had discharged its full statutory duty. Having done so it is not liable because damage resulted through the unlawful act of an independent human agent while using the street.

The sole proximate cause of the collision was the negligence of the operator of the automobile in proceeding along the street in a manner violative of the statutes of the state.

We are constrained, therefore, to reverse the judgment in favor of the plaintiff, appellee, and to enter final judgment for the defendant, appellant.

ROSS, PJ, and HAMILTON, J, concur.